UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANDREW PEIRICK, <br><br> Plaintiff, <br><br> v. <br><br> PIOTR DUDEK, <br><br> Defendant. | No. 20 CV 3013 <br><br> Judge Manish S. Shah |

MEMORANDUM OPINION AND ORDER

Illinois State Trooper Piotr Dudek pulled over Andrew Peirick in the middle of the night after clocking his vehicle going 140 miles per hour on Interstate 90. Dudek questioned Peirick's sobriety, but Peirick denied drinking. Peirick refused to take a breath test and failed two field sobriety tests. Dudek arrested him for driving under the influence. In the approximately fifteen minutes that Peirick sat handcuffed in the back of the squad car before arriving at the station, he repeatedly told Dudek that the handcuffs were too tight. Dudek insisted that the handcuffs were fine and did not check or loosen them. An Illinois judge ultimately found Peirick guilty of exceeding the speed limit by more than 35 mph but not guilty of driving under the influence. Arguing that Dudek's use of handcuffs amounted to excessive force and that his DUI charge was baseless, Peirick brought claims against Dudek for violating the Fourth Amendment under 42 U.S.C. § 1983, and for malicious prosecution under Illinois law. Dudek moves for summary judgment. For the reasons below, the motion is granted.

## I. Legal Standards

Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). I construe all facts and reasonable inferences in Peirick's favor. *Robertson v. Department of Health Services*, 949 F.3d 371, 377–78 (7th Cir. 2020). Dudek is entitled to summary judgment, however, if Peirick has not made "a sufficient showing on an essential element" of his case for which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (nonmovant's version of events must be "backed up by a measure of plausible evidence" in the record).

## II. Background

Just after 3 a.m. on November 5, 2019, Andrew Peirick drove westbound on Interstate 90, just past O'Hare Airport. [63] ¶ 1.[1] Illinois State Trooper Piotr Dudek was on a routine patrol and observed Peirick's Volkswagen Passat traveling behind his squad car at a high rate of speed. *Id.* ¶¶ 1–2.[2] When Peirick passed him, Dudek

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Peirick's response to Dudek's Local Rule 56.1 statement, [63], and Dudek's response to Peirick's statement of additional material facts, [70], where both the asserted fact and the opposing party's response are set forth in one document. When necessary, I also consider other materials in the record. *See* Fed. R. Civ. P. 56(c)(3).

[2] Peirick objects to many of Dudek's asserted facts that are based on his police report, claiming (without argument or citation to legal authority) that the report is inadmissible hearsay. But in civil cases, police reports that record the firsthand observations of an officer are admissible under the public records exception to the hearsay rule, unless the party opposing admission shows that the record is untrustworthy. *See* Fed. R. Evid. 803(8); *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013) ("[P]olice reports have generally been excluded except to the extent to which they incorporate firsthand observations of the officer." (quoting

activated his moving radar and registered Peirick's vehicle going 140 miles per hour (double the speed limit); Dudek then activated his emergency lights and pulled over Peirick. *Id.* ¶¶ 3–4.[3]

Dudek approached the vehicle on the driver's side and asked Peirick for his license and proof of insurance. *Id.* ¶ 5. Peirick produced his license, and while he looked for his insurance, he asked Dudek whether it would make a difference if he had a family member in the Chicago Police Department. *Id.*; [70] ¶ 2. Dudek said that it would not and told Peirick that he was going 140 miles per hour. [63] ¶ 6; [55-3] at 45:4–6. Dudek noticed that Peirick had red and watery eyes and asked him how much he had to drink. [63] ¶ 6; [55-3] at 45:8–12; [55-4] at 3:09:03–12.[4] Peirick said he had not been drinking and suggested that Dudek was smelling his chewing gum. [63] ¶ 7;

---

Fed. R. Evid. 803(8) advisory committee's note)). Dudek's field report documents his firsthand observations of his encounter with Peirick, and Peirick offers no argument suggesting that the report is untrustworthy. In fact, Peirick admits many of the facts that Dudek offers from his police report.

[3] Dudek claims that Peirick changed two lanes without signaling, but he acknowledges that this was not captured on video, and Peirick testified that he used his signal. *See* [55-2] at 4; [55-3] at 32:18–33:8; [55-5] at 72:14–21. Whether Peirick used his signal is disputed.

[4] Peirick denies that his eyes were red and watery or that Dudek detected the smell of alcohol on his breath. The evidence Peirick cites—Dudek's deposition testimony that Peirick denied drinking and was chewing gum and smoking a cigarette—does not controvert Dudek's observations of Peirick's eyes or breath. *See* [63] ¶ 6; [55-3] 46:1–6, 54:13–20. Under the court's Local Rule 56.1(e)(3), a party fails to dispute an asserted fact unless it "cite[s] specific evidentiary material that controverts the fact and [ ] concisely explain[s] how the cited material controverts the asserted fact." *Id.* The smell of alcohol can exist alongside the smell of gum and cigarette smoke. But while the fact is not properly controverted under the Local Rule, I nevertheless accept Peirick's version because other evidence in the record, read in a light most favorable to Peirick, casts doubt on the asserted fact. In his deposition, for example, Peirick testified that he had two bourbon and sodas at least six and a half hours before being pulled over, and he further suggested that Dudek's assertion that he smelled a strong odor of alcohol on Peirick's breath was not plausible. [55-5] at 31:3–20, 74:3–8. Whether Dudek in fact smelled alcohol on Peirick's breath is disputed.

3

[70] ¶ 3. Dudek then returned to his squad car to run a check on Peirick's license and turned off his oscillating lights before reapproaching Peirick's vehicle. [63] ¶¶ 8–10.

Dudek asked Peirick to step out of the car to perform field sobriety tests. *Id.* ¶ 10. Peirick complied and had no problems getting out of his vehicle—he didn't stumble or stagger. [70] ¶ 4. Once out of the vehicle, Dudek told Peirick to spit out his gum and put out the cigarette he was smoking. [63] ¶ 11. While speaking on the shoulder of the road, Dudek asked again how much he had to drink that night; Peirick again denied drinking. *Id.* ¶ 12.

At that point, Dudek informed Peirick that he was going to administer field sobriety tests. *Id.* ¶ 13. Dudek asked Peirick if he wore glasses or contacts, or if he'd taken any medication that night; Peirick denied wearing glasses or contacts but stated that he had a "handicap" due to his hip. *Id.* ¶¶ 14–15. Dudek asked if that meant Peirick could not perform two of the tests—the walk-and-turn and one-leg stand tests—but Peirick did not respond at the time. *Id.* ¶ 16. When Dudek inquired again about medication, Peirick said that he took antidepressant medication. *Id.* ¶ 17.

Dudek then gave Peirick instructions for the horizontal gaze nystagmus test, which measures how much a person's eyes jerk as they attempt to follow an object (often a finger or a pen) horizontally. [63] ¶ 18; [70] ¶ 5.[5] Dudek told Peirick to stand with his feet together with his arms at his sides and to follow Dudek's finger only

---

[5] "The test is premised on the understanding that, whereas everyone's eyes exhibit some jerking while turning to the side, when the subject is intoxicated the onset of the jerking occurs after fewer degrees of turning, and the jerking at more extreme angles becomes more distinct." *Pennsylvania v. Muniz*, 496 U.S. 582, 585 n.1 (1990) (citation and quotation marks omitted).

4

with his eyes without moving his head. [63] ¶ 18. When asked if he understood the instructions, Peirick said it was hard for him to stand because of his hip and offered to let Dudek see his hip multiple times. *Id.* ¶¶ 19–20. Dudek said he believed Peirick about his hip condition and did not want to see it, and he instructed Peirick to support himself against the back of his car for the test. *Id.* ¶¶ 20–21.

Peirick did not follow Dudek's instructions and continued to insist that he had had hip surgery. *Id.* ¶ 22. Dudek sought to clarify whether Peirick was saying that he was unable to stand at all, and Peirick stated that "standing is not a problem, but walking is." *Id.* ¶¶ 22–23. Dudek gave Peirick the instructions for the test again and told him he could support himself on the car, and Peirick confirmed that he understood. *Id.* ¶¶ 24–25. During the test, Dudek had to tell Peirick four times not to move his head and to use only his eyes to follow Dudek's finger. *Id.* ¶ 26. Other than moving his head, Peirick kept his hands by his side, stood still, wasn't staggering or falling down, and didn't lose his balance. [70] ¶ 6.

After completing the horizontal gaze nystagmus test, Dudek asked Peirick whether he could perform the walk-and-turn test and the one-leg stand test. [63] ¶ 27. In response, Peirick repeatedly offered to show Dudek his hip, and Dudek kept telling him that said he did not want to see it. *Id.* ¶¶ 28–29. Peirick then stated that he "can't walk on his hip;" in response, Dudek asked whether he could stand on one leg and Peirick said that his right leg was the bad one but he could stand on his left leg. *Id.* ¶¶ 29–30. When Dudek asked whether Peirick could stand on one leg to perform the one-leg stand test, Peirick asked if he had failed the horizontal gaze nystagmus test.

5

*Id.* ¶ 31. Dudek did not respond to that question and asked Peirick to answer his question about the one-leg stand test, and Peirick said that he had a handicap. *Id.* ¶ 32.

At that point, Dudek asked Peirick to walk back to his squad car with him. *Id.* ¶ 33. On the walk to Dudek's vehicle, Peirick again asked if could show Dudek his hip, and Dudek again said Peirick did not need to show him anything. *Id.* ¶ 34. Dudek retrieved a portable breath test from his squad car and asked Peirick if he'd take the test. *Id.* ¶ 35. Peirick said no and that he'd rather do anything else. *Id.* ¶ 36. Peirick then stated "let's do the walking test," to which Dudek responded, "you said that you are handicapped." *Id.* ¶ 37. Peirick replied that he was handicapped but wanted to do the walk-and-turn test before the breath test. *Id.* Dudek reminded Peirick that he had stated several times that he was unable to perform the walk-and-turn test because of his hip, but Peirick insisted that he now wanted to try it. *Id.* ¶¶ 38–40. Peirick kept asking if he could show Dudek his hip, and Dudek kept saying no. *Id.* ¶¶ 40–41. Dudek said that he did not want to force Peirick to perform the walk-and-turn test if he had a problem with his hip and asked again whether Peirick was physically able to perform the test; Peirick replied, "well now I'm cold." *Id.* Dudek told Peirick not to play games with him, and Peirick said, "I'm not doing that, but I'm cold and I have a problem with my leg." *Id.* ¶ 42. After a few more minutes of a similar exchange, Peirick insisted upon performing the walk-and-turn test; he stated that he had a disability but would "do [the test] anyways—let's see if I pass it." *Id.* ¶ 43.

6

Before instructing Peirick on the walk-and-turn test, Dudek asked again if he had anything to drink that night. *Id.* ¶ 44. Peirick responded: "yeah, six hours—seven hours ago … six, seven, eight hours ago." *Id.* In his police report on this statement, Dudek wrote that "Peirick admitted drinking six drinks seven hours prior." [70] ¶ 17; [55-2] at 5. Dudek also testified during a state-court hearing that Peirick had "stated that seven hours ago he had six drinks." [70] ¶ 18; [55-7] at 35:20–24. Dudek said that if Peirick had something to drink eight hours ago, he should be "absolutely fine" to take a breath test. [63] ¶ 45. Peirick responded, "yeah, but that's not my option," and he continued to insist that he'd rather perform the walk-and-turn test than take the breath test. *Id.* ¶¶ 45–46. Dudek relented and instructed Peirick on how to perform the walk-and-turn test; Peirick listened with his arms by his sides and did not have any problem standing (he did not stagger or fall). *Id.* ¶ 46; [70] ¶ 7.

Peirick then performed the test, walking forward along an imaginary line, pivoting, and walking back. [70] ¶ 9. He put one foot in front of the other, did not raise his arms for balance, and did not lose his balance on the turn. *Id.* But Peirick also missed all the heel-to-toe steps in both directions, took an incorrect number of steps, stepped off the line, and staggered. [63] ¶ 47. Dudek then explained how to perform the one-leg stand test, but Peirick started to complain about his hip; Dudek told him that if he could not perform the test, he should not do it. *Id.* ¶¶ 48–49.

Dudek told Peirick that he had failed both the horizontal gaze nystagmus test and the walk-and-turn test. *Id.* ¶ 50. He then asked Peirick again if he would submit to a breath test to prove that he was below the legal blood-alcohol limit. *Id.* Peirick

7

said that he would "never ever" submit to a breath test. *Id.* ¶ 51. At that point, Dudek placed Peirick under arrest for driving under the influence of alcohol, handcuffed him, and put him in the back of his squad car. *Id.* ¶¶ 51–52; [70] ¶¶ 10, 13. Peirick did not protest or resist in any way. [70] ¶ 11. Dudek did not leave for the station immediately because he had to wait for a tow truck. *Id.* ¶ 13.

Between the time Peirick was handcuffed and his arrival at the station for processing—about fifteen minutes—Peirick repeatedly expressed discomfort with his handcuffs. [63] ¶ 53; [70] ¶¶ 14–15. Specifically, he stated that his handcuffs were: too tight (nine times), uncomfortable (four times), hurting his wrists (once), "strangling his wrists" (once), and starting to hurt his hands (once). [63] ¶ 53; [70] ¶¶ 22–36. In addition to repeatedly telling Dudek that the cuffs were "way too tight," Peirick also noted that he was "in pain," and later, complained that "the procedure is not to cuff someone so tight that their hands start to hurt." [70] ¶¶ 23–25, 27–30, 35. In response to Peirick's initial complaints, Dudek stated that the handcuffs were not tight, he knew what he was doing, Peirick was cuffed properly, and the handcuffs were "not for comfort." [63] ¶ 54; [55-4] at 3:35:35–47. Over the next several minutes waiting for the tow truck, Peirick continued to complain that the handcuffs were too tight, and Dudek continued to insist that Peirick was cuffed properly—he did not check the handcuffs at any point. [70] ¶¶ 15, 37; [55-4] at 3:36:20–44:31. Peirick said that he wanted his hands photographed when he got to the station. [70] ¶ 19; [55-4] at 3:45:06–30. Peirick did not make any other comments regarding any injury or pain

8

he was experiencing due to the handcuffs, and he did not ask for medical attention. [63] ¶¶ 56, 67.

Upon arrival at the station, Peirick was escorted inside and his handcuffs were removed. *Id.* ¶ 57. Dudek did not take any photos of Peirick's wrists, nor did he instruct any other officer to do so. *Id.* ¶¶ 58–59; [70] ¶ 19. Dudek placed Peirick under a 20-minute observation period, advised him of his Miranda rights, and asked him to submit to a breath test (which Peirick again refused). [63] ¶ 61. Dudek wrote four traffic citations for Peirick: (1) exceeding the speed limit by more than 35 miles per hour; (2) driving under the influence of alcohol; (3) failing to signal when changing lanes; and (4) improper use of the left lane. *Id.* ¶ 63. Peirick was released on bond just before 5 a.m. and took an Uber home. *Id.* ¶ 64. Upon arriving home, Peirick took three photographs of his right wrist. *Id.* ¶¶ 68–70. The photos show a small red mark in the shape of a line across approximately half of the back of Peirick's wrist. *Id.* ¶ 70; [55-6]. There's no evidence that Peirick suffers from any continued pain or discomfort in his wrists as a result of being handcuffed by Dudek, or and he never saw a doctor about any physical injury caused by the handcuffs. [63] ¶¶ 67, 73.

The next spring, Peirick appeared in state court for his petition to rescind the summary suspension of his driver's license related to the November 5 stop and arrest. *Id.* ¶ 77. The court found Peirick guilty of exceeding the speed limit by more than 35 miles per hour but not guilty of driving under the influence (he was also found not guilty of the other two traffic violations). [63] ¶ 80; [70] ¶ 38; [55-7] at 56:8–13, 58:11–23. Peirick then filed this suit, bringing claims against Dudek for excessive force in

9

violation of the Fourth Amendment and 42 U.S.C. § 1983 (Count I), and for malicious prosecution under Illinois law (Count II). [20]. Dudek moves for summary judgment.

### III. Analysis

#### A. Excessive Force

Peirick bases his excessive-force claim solely on his allegations that Dudek fastened his handcuffs too tightly and—despite Peirick's repeated complaints that they were too tight—refused to check or loosen them.

Section 1983 authorizes suits against officers who violate an individual's constitutional rights while acting under color of state law. *See* 42 U.S.C. § 1983. An officer violates an arrestee's Fourth Amendment right to be free from unreasonable seizures when he "uses greater force than reasonably necessary to make an arrest." *Day v. Wooten*, 947 F.3d 453, 460–61 (7th Cir. 2020). The "reasonableness" of an officer's use of force "is judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Sow v. Fortville Police Dep't*, 636 F.3d 293, 303 (7th Cir. 2011) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). A lawful arrest "necessarily carries with it the right to some degree of physical coercion to effect it," but "[n]ot every push or shove, even if it may later seem unnecessary … violates the Fourth Amendment." *Sow*, 636 F.3d at 304 (quoting *Graham*, 490 U.S. at 396) (quotation marks omitted). Yet while "[a]n officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest, [ ] that right is circumscribed by the Fourth

10

Amendment's insistence on reasonableness." *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009) (citation omitted).

As such, an excessive-force claim may be based on unreasonably tight handcuffs. *See Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006); *see also Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014) ("A person has the right to be free from an officer's knowing use of handcuffs in a way that would inflict unnecessary pain or injury, if that person presents little or no risk of flight or threat of injury."). In *Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003), for example, the court held that an excessive-force plaintiff was entitled to reach a jury when the record contained evidence that: (1) the defendant handcuffed the plaintiff so tightly that she lost feeling in her hands, (2) the defendant refused to loosen the cuffs when she told them of the numbness, (3) the defendant fought with other officers over plaintiff's arm for thirty minutes and twisted her arm, and (4) the plaintiff later underwent two carpal tunnel surgeries because of the handcuffing. *Id.* at 774–75, 779–81. And in *Herzog v. Village of Winnetka*, 309 F.3d 1041 (7th Cir. 2002), the court held that the plaintiff's excessive-force claim survived summary judgment based on evidence that arresting officers: (1) lacked probable cause for her arrest, (2) shoved her to the ground when she was not resisting, (3) forced a breath-screening device into her mouth, cracking her tooth, (4) waited over an hour to loosen handcuffs she complained were too tight, and (5) subjected her to blood and urine testing at a hospital, even though she had passed all field sobriety tests and registered a 0.00 on a breath test. *Id.* at 1043–44.

But to defeat summary judgment, a plaintiff must do more than rely on discomfort and pain from tight handcuffs. In *Tibbs v. City of Chicago*, 469 F.3d 661 (7th Cir. 2006), the record contained the following evidence supporting the plaintiff's excessive-force claim:

> Tibbs likely suffered some discomfort and pain from handcuffs that Officer Kooistra applied somewhat too tightly; Tibbs complained to Officer Kooistra once about his handcuffs without elaborating on any injury, numbness, or degree of pain; Tibbs was handcuffed for about twenty-five to thirty minutes (from the time of his arrest to his arrival at the lockup facility); he experienced redness on his wrists for less than two days; and he neither sought nor received medical care for any alleged wrist injury.

*Id*. at 666. The court concluded that no reasonable jury could find for Tibbs "based on such mild allegations." *Id*. *Payne* was different, the court reasoned, because "the plaintiff in *Payne* told the officers her hands were numb and ultimately underwent two surgeries because of wrist injuries caused by the too-tight handcuffs," while "Tibbs complained only once to Officer Kooistra, gave the officers no indication of the degree of his pain, experienced minimal (if any) injury, and sought no medical care." *Id*. (citation omitted). *Herzog* was likewise inapplicable, said the court, because the case was "hardly based on overly tight handcuffs alone." *Id*. Rather, the *Herzog* plaintiff presented evidence that she "had suffered numerous additional injuries," including a cracked tooth and gratuitous blood and urine testing. *Id*.

Similarly, in *Sow v. Fortville Police Department*, 636 F.3d 293 (7th Cir. 2011), the plaintiff failed to get past summary judgment based on his complaint to an officer that his handcuffs were too tight. *Id*. at 304. Because the plaintiff failed to elaborate on any injury and did not receive any medical treatment resulting from the use of the

12

handcuffs, the facts were "not sufficient to raise a genuine issue of material fact regarding whether [the defendant] used excessive force." *Id*.

Peirick has failed to produce sufficient evidence to defeat summary judgment. There is no dispute that Dudek had the lawful authority to arrest Peirick for going 140 mph in a 70-mph zone. *See Tapley v. Chambers*, 840 F.3d 370, 378 (7th Cir. 2016) ("As long as there is probable cause to stop someone for a crime—even a minor one like a traffic offense—the Fourth Amendment permits an arrest." (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001))). In the approximately fifteen minutes Peirick spent handcuffed in the back of Dudek's squad car, he complained that the handcuffs were too tight, uncomfortable, and causing pain. When he got home from the station, Peirick took photos showing a small red mark on his right wrist. But minor redness on his wrists immediately following a lawful arrest does not, without more, suggest excessive force, especially when Peirick offered no evidence of short- or long-term wrist injury and concedes he received no medical care for either wrist or hand. *See Tibbs*, 469 F.3d at 666.[6]

Because there is no "indication that his arrest was effected in an unusual or improper manner," *Braun v. Baldwin*, 346 F.3d 761, 763 (7th Cir. 2003), no

---

[6] Peirick compares the facts of his case to *Threlkeld v. White Castle Sys., Inc.*, 201 F.Supp.2d 834 (N.D. Ill. 2002). There, the court concluded that the plaintiff had presented enough evidence to survive summary judgment on an excessive-force claim based on tight handcuffs. *Id*. at 841. While there was no evidence that the plaintiff resisted when she was handcuffed and officers did nothing in response to her complaints, the plaintiff in *Threlkeld* also offered evidence that the handcuffs "cut into her skin and left a mark nearly two years later" and "still ha[d] pain in her wrists, which one doctor told her might have been caused by tight handcuffs." *Id*. The case is not analogous because there is no evidence that Peirick sustained any injuries as a result of Dudek's handcuffs.

13

reasonable jury could find that the handcuffs were excessively tight. Peirick says that his case is different because the plaintiffs in *Tibbs* and *Sow* complained only one or two times about their handcuffs, while he repeatedly told Dudek that the handcuffs were too tight. But repeating the same general complaints that his handcuffs were too tight and hurting his wrists—without any elaboration on his pain or evidence that the handcuffs were in fact too tight—is not enough to raise a genuine dispute of material fact on his excessive-force claim. Discomfort and pain from handcuffs are not by themselves proof of unconstitutional force. Peirick's subjective contemporaneous complaints—without any evidence of injury or unreasonable duration—are not enough to allow a jury to conclude that Dudek inflicted unnecessary pain on Peirick.

### B. Qualified Immunity

What's more, even if the Fourth Amendment required Dudek to take Peirick's complaints more seriously, Dudek would still be entitled to qualified immunity. The doctrine of qualified immunity shields government officials from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once raised, the plaintiff bears the burden of showing that the defendant violated a constitutional right and that the constitutional right at issue was clearly established at the time of the alleged violation. *See Fosnight v. Jones*, —F.4th—, No. 20-1033, 2022 WL 2965668, at *5 (7th Cir. July 27, 2022). "A failure to show either is fatal for the plaintiff's case." *Id.* (citation omitted). To be

14

clearly established, a Fourth Amendment right "must be defined more specifically than simply the general right to be free from unreasonable seizure" because "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Day*, 947 F.3d 453, 461 (7th Cir. 2020) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)).

There is no Seventh Circuit or Supreme Court case clearly establishing that Dudek's conduct—failure to check and adjust handcuffs following repeated general complaints about tightness—violated Peirick's rights. Peirick argues that at the time of his arrest, "the right to be free from unreasonably tight handcuffing was clearly established under *Payne*." [62] at 7. The Seventh Circuit has clarified, however, that *Payne* established a narrower right: "it was unlawful to use excessively tight handcuffs and violently yank the arms of arrestees who were not resisting arrest, did not disobey the orders of a police officer, did not pose a threat to the safety of the officer or others, and were suspected of committing only minor crimes." *Day*, 947 F.3d at 461 (quoting *Payne*, 337 F.3d at 780).

The facts here differ from those in *Payne*. Dudek did not violently yank or jerk Peirick's arms and shoulders or cause any injury suggesting that handcuffs were any tighter than they would have been in a typical arrest. Neither *Payne* nor *Herzog* (nor any other case) has established a right to have an officer adjust and loosen handcuffs upon an arrestee's repeated complaints to an officer.[7] To the contrary, because the

---

[7] Plaintiff also cites *Vainder ex rel. Vainder v. Powell*, No. 03 C 1509, 2004 WL 1660618 (N.D. Ill. July 26, 2004). But "district court opinions cannot clearly establish a constitutional right because they are not binding precedential authority." *Day*, 947 F.3d at 462.

15

decisions in *Tibbs* and *Sow* "both found in the officer's favor on similar allegations … there was nothing that would have alerted [Dudek] to the fact that a constitutional violation was looming." *Rooni*, 742 F.3d at 743. Without notice of a known injury to Peirick, Dudek did not violate a clearly established right by refusing to loosen the handcuffs. *See Day*, 947 F.3d at 463 ("[L]ike the right in *Payne*, *Rooni*, and *Tibbs*, the right at issue in *Stainback* to have a *known* injury or condition considered by officers when handcuffing an arrestee is not implicated by the facts of this case.").

### C. Malicious Prosecution

To prevail on his malicious-prosecution claim under Illinois law, Peirick must show that: "(1) he was subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendant[ ] instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury." *Martinez v. City of Chicago*, 900 F.3d 838, 849 (7th Cir. 2018) (citation omitted). The existence of probable cause is a complete defense to a malicious-prosecution claim. *See id.*; *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015). Probable cause "is a common-sense inquiry requiring only a probability of criminal activity; it exists whenever an officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred." *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021) (quoting *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010)). An officer's belief need not be "correct or even more likely true than false, so long as it is reasonable." *Gaddis v. DeMattei*, 30 F.4th 625, 630–31 (7th Cir. 2022) (citation omitted). Instead, probable cause exists "when, given the totality of the

16

circumstances, a reasonable officer would believe that the suspect had committed a crime." *Cibulka v. City of Madison*, 992 F.3d 633, 638 (7th Cir. 2021) (citation and quotation marks omitted).

Dudek possessed probable cause to believe that Peirick was driving under the influence of alcohol, barring any malicious-prosecution claim based on that charge.[8] To recap, Dudek stopped Peirick at 3 a.m. for going 70 mph over the speed limit and when he approached the vehicle, he noticed that Peirick had red and watery eyes. Peirick denied drinking initially but repeatedly refused to take a breath test. *See People v. Johnson*, 218 Ill.2d 125, 140 (2005) ("[E]vidence of a person's refusal to take a test designed to determine the person's blood-alcohol content is admissible and may be used to argue the defendant's consciousness of guilt."); *People v. Garriott*, 253 Ill.App.3d 1048, 1052 (4th Dist. 1993) ("[A] driver's refusal is relevant because it implies that he believes he is intoxicated, something he is clearly in a prime position to appraise. The police officer's statutory inability to *require* the driver to submit to the breathalyzer test neither affects the relevancy of the driver's refusal nor diminishes its evidentiary value."). When Dudek administered the horizonal gaze nystagmus test, Peirick failed to follow directions and keep his head still, and ultimately, failed the test. When asked again whether he'd had anything to drink, Peirick changed his story and admitted to drinking six to eight hours prior. Still, Peirick continued to refuse to submit to a breath test and insisted that he could do

---

[8] The amended complaint bases the malicious-prosecution claim solely on the DUI charge. [20] ¶¶ 22–24.

17

the walk-and-turn test. He failed that test, too, and after he refused a breath test again, it was reasonable for Dudek to conclude that Peirick was under the influence.

Peirick's argument to the contrary is unpersuasive. Dudek lacked probable cause, says Peirick, because Peirick: (1) denied drinking; (2) testified that Dudek smelled his chewing gum and a cigarette; and (3) "[e]ven though he was disabled," he "performed satisfactory" on the field sobriety tests. [62] at 11–12. But Peirick's conclusory assertion that he performed satisfactorily on the field sobriety test finds no support in the record—there's no evidence that any issues with his hip prevented him from performing the horizontal gaze nystagmus test, and Peirick insisted on performing the walk-and-turn test to avoid taking a breath test. That Peirick initially denied drinking and Dudek smelled chewing gum and a cigarette does not alter the probable-cause analysis. Dudek still had probable cause to believe Peirick had been driving under the influence based on his extreme speeding, repeated refusals to take a breath test, and failed field sobriety tests. *See Holloway v. City of Milwaukee*, — F.4th—, No. 21-3007, 2022 WL 3152594, at \*6 (7th Cir. Aug. 8, 2022) ("If the underlying facts supporting the probable cause determination are not in dispute, … the court can decide whether probable cause exists." (quoting *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993))).[9]

---

[9] Dudek's false statements and testimony that Peirick admitted to drinking six drinks seven hours earlier do not affect the probable-cause analysis either. The objective undisputed facts (speed, failure of field sobriety tests, refusal to take a breath test) provided any reasonable officer in Dudek's position with probable cause to suspect Peirick had driven under the influence of alcohol.

18

Because probable cause bars Peirick's malicious-prosecution claim, I do not reach Dudek's arguments regarding state-law immunity.

## V. Conclusion

Dudek's motion for summary judgment, [53], is granted. Enter judgment and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: August 10, 2022